Joseph G. Sansone
Co-Chief, Market Abuse Unit
Michael D. Birnbaum
Simona K. Suh
Charu A. Chandrasekhar
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-0523 (Birnbaum)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> -against- <br><br> MICHAEL J. MACIOCIO AND DAVID P. HOBSON, <br><br> Defendants. | No. 16 Civ. 4139 <br><br> <u>COMPLAINT</u> <br><br> JURY TRIAL DEMANDED |

Plaintiff Securities and Exchange Commission ("Commission") files this Complaint against Defendants Michael J. Maciocio ("Maciocio") and David Paul Hobson ("Hobson"), and alleges as follows:

## SUMMARY

1.      This case involves a multi-year insider trading scheme orchestrated by Maciocio, then an employee of a multinational pharmaceutical corporation ("PharmaCo"), and his childhood friend and securities broker Hobson. From 2008 to 2014 (the "Relevant Period"), Maciocio repeatedly misappropriated material nonpublic information about PharmaCo's potential business deals with other pharmaceutical companies to trade unlawfully in the

securities of those companies. Maciocio reaped over $116,000 in profits from his illegal trading. Maciocio also tipped PharmaCo's material nonpublic information to Hobson, who in turn traded the securities of the same companies in his own accounts and in several customer accounts. Hobson reaped at least $187,000 in illicit profits for himself and at least $145,000 in illicit profits for his brokerage customers.

2.      During the Relevant Period, PharmaCo evaluated certain pharmaceutical companies as potential acquisition targets or business partners. The existence, nature and timing of PharmaCo's inquiries were material to investors. PharmaCo kept its inquiries and other information about the potential deals confidential.

3.      During the Relevant Period, Maciocio first worked as an Associate Research Fellow and then as a Director of Chemical Research and Development at PharmaCo. PharmaCo designated Maciocio as a "master planner" who evaluated PharmaCo's capacity to manufacture certain pharmaceutical compounds. As part of his responsibilities, Maciocio sometimes evaluated PharmaCo's capacity to manufacture drugs being developed by other companies that PharmaCo was considering as potential acquisition targets or business partners.

4.      Hobson was Maciocio's childhood friend and, during the Relevant Period, was employed as a registered representative at various brokerage firms. Starting in the mid-1990s, Maciocio maintained brokerage accounts with Hobson at the brokerage firms where Hobson worked. In 2010, when Hobson moved from one of those firms ("Broker-Dealer A") to another firm ("Broker-Dealer B"), Maciocio also moved his accounts from Broker-Dealer A to Broker-Dealer B. Hobson also held his own accounts (at Broker-Dealer A and later at Broker-Dealer B) and served as the registered representative for several other customer accounts at both firms. During the Relevant Period, Maciocio and Hobson were close friends who routinely

2

spoke with each other, not only about securities trading, but also about personal matters such as family challenges and political issues.

5.     The Maciocio-Hobson insider trading scheme began in 2008, when PharmaCo explored a potential licensing deal with Medivation, Inc. ("Medivation"). In furtherance of this effort, Maciocio helped to evaluate PharmaCo's ability to manufacture a drug candidate under development by Medivation. Through this work, Maciocio obtained material nonpublic information about PharmaCo's interest in entering into a transaction with Medivation.

6.     In breach of his duties to PharmaCo, Maciocio misappropriated this material nonpublic information by trading in Medivation securities between May and August 2008. Maciocio sold his Medivation securities immediately upon PharmaCo's September 3, 2008 announcement that it had signed a significant licensing deal with Medivation, realizing at least $3,846 in illicit profits.

7.     In breach of his duties to PharmaCo, Maciocio also tipped Hobson material nonpublic information concerning PharmaCo's interest in a business transaction with Medivation. Hobson traded on Maciocio's tips about PharmaCo's interest in a transaction with Medivation, both in his own accounts and in several customer accounts at Broker-Dealer A. From his Medivation trades, Hobson realized at least $122,343 in illicit profits for himself and least $100,169 in illicit profits for his customers.

8.     Following their profitable insider trading in Medivation securities, Maciocio and Hobson continued their scheme for approximately six years. On at least two additional occasions—those involving the securities of Ardea Biosciences, Inc. ("Ardea") and Furiex Pharmaceuticals, Inc. ("Furiex") —Maciocio's and Hobson's illegal trades resulted in significant trading profits.

9.     From 2010 through 2012, Maciocio participated in the evaluation of PharmaCo's capacity to manufacture a drug candidate under development by Ardea, which PharmaCo was considering as a potential acquisition target.  Through this work, Maciocio obtained material nonpublic information about PharmaCo's interest in acquiring Ardea.

10.    In breach of his duties to PharmaCo, Maciocio misappropriated this material nonpublic information by trading in Ardea securities himself and by tipping Hobson.  Although PharmaCo ultimately did not acquire Ardea, Maciocio profited from his trading in Ardea securities in 2012, realizing at least $42,212 in illicit profits after Ardea announced in April 2012 that it would be acquired by another pharmaceutical company.

11.    In breach of his duties to PharmaCo, Maciocio also tipped Hobson material nonpublic information concerning PharmaCo's interest in acquiring Ardea.  Hobson traded on Maciocio's tips about PharmaCo's interest in acquiring Ardea, both in his own accounts and in several customer accounts.  From his illicit Ardea trades, Hobson realized at least $34,113 in illicit profits for himself and at least $5,445 in illicit profits for his customers.

12.    In early 2014, PharmaCo explored a potential acquisition of Furiex.  In furtherance of this effort, Maciocio helped to evaluate PharmaCo's capacity to manufacture a drug candidate under development by Furiex.  Through this work, Maciocio obtained material nonpublic information about PharmaCo's interest in acquiring Furiex.

13.    In breach of his duties to PharmaCo, Maciocio misappropriated this material nonpublic information by purchasing Furiex securities in March and April 2014.  Although PharmaCo ultimately decided not to acquire Furiex, Maciocio held his Furiex shares through the April 28, 2014 announcement of Furiex's acquisition by another pharmaceutical company.  He liquidated his entire Furiex position that day, realizing approximately $70,719 in illicit profits.

4

14.     In breach of his duties to PharmaCo, Maciocio also tipped Hobson material nonpublic information concerning PharmaCo's interest in acquiring Furiex.  Hobson traded on Maciocio's tips about Pfizer's interest in acquiring Furiex, both in his own accounts and in several customer accounts.  From his illicit Furiex trades, Hobson realized approximately $30,865 in illicit profits for himself and approximately $40,323 in illicit profits for his customers.

15.     Maciocio tipped Hobson in exchange for personal benefits to Maciocio, including investment advice, and also as a gift to Hobson, who was Maciocio's close personal friend.

16.     At all times, Hobson knew or had reason to know that Maciocio's tips were made in breach of his fiduciary duty to PharmaCo, and yet Hobson intentionally or recklessly traded on Maciocio's tips.

## VIOLATIONS

17.     By virtue of the conduct alleged here, Maciocio and Hobson engaged in insider trading in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

18.     Unless Maciocio and Hobson are permanently restrained and enjoined, they will again engage in the acts, practices and courses of business set forth in this Complaint and in acts, practices and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

19.     The Commission brings this action under the authority conferred upon it by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].  The Commission seeks to permanently enjoin Maciocio and Hobson from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and seeks an order requiring Maciocio and Hobson to

disgorge all ill-gotten gains from the unlawful insider trading activity as set forth in this

Complaint, together with prejudgment interest.  The Commission also brings this action,

pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1], for civil penalties against

Maciocio and Hobson.

## JURISDICTION AND VENUE

20.      This Court has jurisdiction over this action pursuant to Sections 21A and 27 of the

Exchange Act [15 U.S.C. §§ 78u-1 &78aa].

21.      Venue lies in this District pursuant to Section 27 of the Exchange Act [15 U.S.C.

§ 78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this

Complaint occurred within the Southern District of New York.  Among other things, venue lies

in this District because Maciocio and Hobson executed numerous illegal trades as part of their

scheme in brokerage accounts held at Broker-Dealer B, whose headquarters and securities

clearing operations are located in New York City.  Maciocio and Hobson also illegally traded as

part of their scheme in securities listed on the NASDAQ Stock Market, the NASDAQ Global

Market and the NASDAQ Global Select Market, which are also headquartered in New York

City.

## DEFENDANTS

22.      **Maciocio**, age 46, resides in Wakefield, Rhode Island.  From 1998 to 2014,

Maciocio worked at PharmaCo in various roles relating to PharmaCo's manufacturing processes.

During the Relevant Period, Maciocio worked as a Director of Chemical Research and

Development at PharmaCo.

23.      **Hobson**, age 47, resides in Providence, Rhode Island.  During the Relevant

Period, he worked as a registered broker-dealer representative and investment adviser

representative at Broker-Dealers A and B and held multiple FINRA securities licenses.

## RELEVANT ENTITIES

24.     **Medivation** is a Delaware corporation with headquarters in San Francisco, California.  Its common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the NASDAQ Stock Market under the ticker symbol "MDVN."

25.     **Ardea** was a Delaware corporation with headquarters in San Diego, California. In 2012, AstraZeneca PLC ("AstraZeneca") acquired Ardea.  Prior to that acquisition, Ardea's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ Global Select Market under the ticker symbol "RDEA."

26.     **Furiex** was a Delaware corporation with headquarters in Morrisville, North Carolina.  In 2014, Forest Labs, Inc. ("Forest Labs") acquired Furiex.  Prior to that acquisition, Furiex's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ Global Market under the ticker symbol "FURX."

## FACTS

### A.     The Maciocio-Hobson Relationship

27.     Maciocio and Hobson were childhood friends who both grew up in Rhode Island, where they played Little League baseball together and attended the same high school.

28.     At a bachelor party that both Maciocio and Hobson attended in the mid-1990s, Hobson told Maciocio that he was working in the financial services industry.  Shortly thereafter, Maciocio opened a brokerage account with the firm where Hobson worked at the time, selecting Hobson as the registered representative on the account.  When Hobson left Broker-Dealer A for Broker-Dealer B in 2010, Maciocio moved his accounts from Broker-Dealer A to Broker-Dealer B out of loyalty to his friend.  Even though Broker-Dealer B charged higher commissions than

the online discount brokerage where Maciocio also held an account, Maciocio maintained

accounts at Broker-Dealer B out of loyalty to Hobson.  Overall, Hobson served as Maciocio's

broker for almost twenty years.

29.     In or around 2008, Maciocio began misappropriating PharmaCo's material

nonpublic information to trade securities and tipping this information to Hobson, intending that

Hobson trade on the tips and benefit from them.

30.     During the Relevant Period, Hobson also routinely provided investment advice

and specific stock tips to Maciocio, including specific recommendations sought by Maciocio for

aggressive securities trading in his retirement account.

31.     During the Relevant Period, Maciocio and Hobson often spoke by phone—

sometimes, several times a day—and frequently emailed each other.  Maciocio and Hobson also

shared confidences about personal and family matters and discussed politics.  Hobson also

attended the funeral of Maciocio's mother in 2010.

**B.     The Maciocio-Hobson Insider Trading Scheme**

32.     At all relevant times, PharmaCo maintained company-wide policies that required

employees to protect the confidentiality of company-related information and that prohibited

trading securities on the basis of material nonpublic information acquired from the company.  At

all relevant times, PharmaCo also required its employees to confirm that they had read and

understood these policies, and that they agreed to abide by them.

33.     On an annual basis during the Relevant Period, Maciocio completed the

PharmaCo "Integrity Pledge," in which he attested that he had read, understood and agreed to

abide by the Summary of PharmaCo Policies on Business Conduct (the "Blue Book").  The Blue

Book explained that insider trading was illegal, and that PharmaCo prohibited its employees

8

from using or disclosing any inside information that they acquired during the course of employment at PharmaCo. Since at least 2012, the Blue Book further explained that its employees were prohibited from using information gained through employment with PharmaCo "before this information is known publicly, to buy or sell the securities of [PharmaCo] or any other company with which [PharmaCo] has or may be considering a relationship (for example, a customer, supplier, alliance partner, or potential acquisition candidate)." To complete the PharmaCo Integrity Pledge, Maciocio also agreed to report "all suspected or potential violations of law and/or the standards of business conduct set forth in the Blue Book" of which he was currently aware, or would become aware of in the future.

34.     During the Relevant Period, in the course of his employment, Maciocio obtained material nonpublic information about PharmaCo's consideration of acquisitions of or transactions with multiple other public companies, including Medivation, Ardea and Furiex. PharmaCo treated the information as confidential, including through the use of code names for the transactions and policies and procedures designed to protect such information and to prohibit its employees from trading on such information.

35.     Maciocio owed PharmaCo a fiduciary duty, or an obligation arising from a similar relationship of trust or confidence, to keep confidential material nonpublic information about PharmaCo's potential transactions (including their existence and nature) with other public companies, including Medivation, Ardea and Furiex, and to refrain both from trading on the basis of such information and from tipping such information to others.

36.     Maciocio knew or was reckless in not knowing that he owed a fiduciary duty, or an obligation arising from a similar relationship of trust or confidence, to PharmaCo to keep the information confidential and to refrain from trading on it and from tipping it to others.

37.    Maciocio knowingly or recklessly breached these duties by trading in the securities of multiple companies, including Medivation, Ardea and Furiex, on the basis of the material nonpublic information that he obtained from PharmaCo.  Maciocio realized over $116,000 in illicit profits from his trades in the securities of Medivation, Ardea and Furiex.

38.    In knowing or reckless breach of his duties to PharmaCo, Maciocio also tipped Hobson material nonpublic information about PharmaCo's interest in business transactions with multiple companies, including Medivation, Ardea and Furiex.  Maciocio tipped Hobson with the intent that Hobson trade on the tips and benefit from those trades.

39.    Maciocio knew or was reckless in not knowing that the information on which he traded and which he tipped Hobson was material and nonpublic.  At no time did Maciocio disclose to PharmaCo either that he himself was trading on PharmaCo's confidential information or that he was tipping Hobson with that information.

40.    During the Relevant Period, Hobson worked first at Broker-Dealer A and then, starting in 2010, as a Director at Broker-Dealer B.  As an experienced and licensed securities industry professional, Hobson received instruction on prohibitions against insider trading in multiple contexts during the Relevant Period.  For example, when Hobson commenced his employment with Broker-Dealer B in 2010, he attested that he had read and understood the firm's insider trading policies and procedures and agreed to comply in all respects with these requirements.  Those policies prohibited Hobson from trading, "personally or on behalf of another, on material non-public information," a term defined to include nonpublic information about "significant merger or acquisition proposals or agreements" and news about "entering into or termination of significant contractual arrangements."

10

41.     Hobson knew or had reason to know that Maciocio was breaching his fiduciary duty or a similar duty of trust or confidence to PharmaCo when Maciocio tipped him material nonpublic information about Medivation, Ardea and Furiex, among other companies. For instance, because Hobson feared that his work phone line was recorded, Hobson instructed Maciocio not to call him on Hobson's work phone (and instead to call Hobson's cell phone) with tips about PharmaCo's nonpublic information. Hobson intentionally or recklessly traded on Maciocio's tips of material nonpublic information in the securities of multiple companies, including Medivation, Ardea and Furiex, both for his own accounts and for several customer accounts. From his insider trading, Hobson realized illicit profits of at least $187,000 for himself and at least $145,000 for his customers.

## C.   Insider Trading in Medivation Securities

42.     In January 2008, PharmaCo began evaluating a potential business transaction with Medivation. PharmaCo was interested in a potential deal with Medivation because Medivation had recently announced plans to commence a pivotal confirmatory Phase III[1] clinical trial for Dimebon, its drug candidate for the treatment of Alzheimer's disease.

43.     On March 6, 2008, PharmaCo and Medivation signed a confidentiality agreement relating to a potential transaction between the two companies. PharmaCo also adopted the code name "Madeline" for Medivation in order to protect the confidentiality of the potential transaction. In early March 2008, a team from PharmaCo visited Medivation's California headquarters to conduct due diligence. In April 2008, Medivation sent PharmaCo an initial term sheet; in late May 2008, PharmaCo approved the financial terms for the project.

---

[1]     Before a pharmaceutical company can release a new drug, it must conduct clinical trials to determine whether the drug is safe and effective. Clinical trials generally proceed in three phases (designated I through III). Phase III is the last stage of clinical review before submission of a New Drug Application ("NDA") to the Food and Drug Administration ("FDA").

44.     On or about May 27, 2008, Maciocio learned through his work at PharmaCo that
PharmaCo was pursuing a potential business transaction with a company given the code name
"Madeline."

45.     A senior director at PharmaCo involved in due diligence on PharmaCo's potential
acquisitions ("Senior Director") also shared with Maciocio several details about "Madeline" and
its drug candidate that were necessary for Maciocio to evaluate PharmaCo's ability to
manufacture "Madeline's" drug candidate, including the drug candidate's indication for the
treatment of Alzheimer's disease; therapeutic dosage; chemical structure; clinical development
status; and the anticipated timing of an NDA filing.  The Senior Director shared this information
with Maciocio so that Maciocio could assist in the determination of PharmaCo's ability to
manufacture "Madeline's" drug candidate.

46.     Using the information about "Madeline" that he obtained from PharmaCo,
Maciocio determined that "Madeline" was Medivation.  On or about May 27, 2008, Maciocio
tipped Hobson that PharmaCo was considering a business transaction with Medivation.  This
information was material and nonpublic.

47.     On May 28, 2008, Maciocio and Hobson both began purchasing Medivation
shares.  As PharmaCo continued to evaluate a transaction with Medivation over the following
months, both Maciocio and Hobson continued to purchase and sell Medivation securities.
During this time, Hobson also purchased and sold Medivation securities in several customer
accounts.

48.     On or about July 31, 2008, Maciocio learned that PharmaCo and Medivation were
in final negotiations over the deal terms.  On August 7, 2008, Maciocio received access to an
electronic data room containing due diligence materials for the deal.  On August 13, 2008,

Maciocio purchased 500 Medivation shares for his account with an online discount brokerage firm ("Discount Brokerage Account").

49.     Starting on July 31, 2008 and continuing through the next few weeks, Hobson also began purchasing Medivation securities for his own accounts at Broker-Dealer A; in August 2008, he purchased Medivation securities for multiple customer accounts at Broker-Dealer A. By September 2, 2008, Hobson had accumulated 15,800 Medivation shares and thirty Medivation call options in his own accounts and 9,750 Medivation shares in his customers' accounts.

50.     At 8:30 a.m. on September 3, 2008, PharmaCo and Medivation announced an agreement valued at up to $775 million to develop and commercialize Medivation's drug candidate, Dimebon.  Medivation's stock opened that morning at $33.80 per share, which represented an increase of 29.9 percent from its closing price on September 2, 2008.  The volume of Medivation shares traded that day was 649 percent higher than the trading volume on the previous trading day of September 2, 2008.

51.     That morning, Maciocio liquidated all of his holdings of Medivation shares for illicit profits of approximately $3,846, and Hobson liquidated all of his Medivation shares and options for illicit profits of approximately $122,343.  Starting that day and continuing over the next several days, Hobson also liquidated all of his customers' Medivation stock holdings for illicit profits of approximately $100,169.

**D.**     **Insider Trading in Ardea Securities**

   **1.**     **PharmaCo's Initial Consideration of Ardea in 2010-2011**

   52.     From April 2010 to March 2011, PharmaCo considered a potential acquisition of Ardea.  PharmaCo was interested in acquiring Ardea because the company had a promising drug candidate for the treatment of gout.

   53.     In April 2010, PharmaCo and Ardea signed a confidentiality agreement relating to a potential transaction between the two companies.  PharmaCo also adopted the code name of "Athens" for Ardea in order to protect the confidentiality of the potential acquisition.  In June 2010, PharmaCo submitted a non-binding preliminary indication of interest in acquiring Ardea.

   54.     In early June 2010, the Senior Director learned that PharmaCo was considering a potential transaction with Ardea.  Over approximately the next two to three weeks, the Senior Director informed Maciocio about this potential transaction in order to obtain Maciocio's assistance in analyzing PharmaCo's capacity to manufacture Ardea's drug candidate.

   55.     Although he did not reveal the target company's name, the Senior Director shared with Maciocio certain details about the company and its drug candidate that were necessary for Maciocio to evaluate PharmaCo's capacity to manufacture Ardea's drug candidate.  The Senior Director told Maciocio that "Athens's" principal drug candidate was in Phase II clinical trials and was indicated for the treatment of gout.  The Senior Director also shared with Maciocio the drug candidate's large dosage size of 600 milligrams because it would require significant manufacturing capacity.

   56.     Using the information about "Athens" that he obtained from PharmaCo, Maciocio determined that "Athens" was Ardea.  Shortly thereafter, Maciocio tipped Hobson that

PharmaCo was considering a potential acquisition of Ardea. This information was material and nonpublic.

57.     As PharmaCo continued to evaluate a transaction with Ardea over the next several months, both Maciocio and Hobson continued to buy and sell Ardea securities. Hobson traded Ardea securities during this time period both for his own accounts and for several customer accounts.

58.     In early September 2010, after PharmaCo learned certain negative information about Ardea's drug candidate, both Maciocio and Hobson liquidated their holdings of Ardea securities. Yet when PharmaCo later learned positive information about the drug candidate in early 2011, Maciocio again purchased Ardea shares.

59.     In mid-March 2011, Maciocio learned that PharmaCo had decided that it would not pursue an acquisition of Ardea. Maciocio subsequently sold Ardea shares on March 21 and 22, 2011. Starting late on the morning of March 21, 2011, and continuing over the next two days, Hobson similarly liquidated portions of the Ardea stock holdings that he had accumulated in his own and his customers' accounts.

## 2.     PharmaCo's Consideration of Ardea in 2012

60.     In late November 2011, PharmaCo renewed its consideration of a potential acquisition of Ardea. In order to protect the confidentiality of the deal, PharmaCo again used the code name "Athens" for Ardea.

61.     On Tuesday, March 6, 2012, PharmaCo commenced a second round of due diligence on Ardea. Ardea provided PharmaCo with access to an electronic data room containing due diligence materials for the deal.

62.     On or about the morning of March 6, 2012, the Senior Director learned that PharmaCo had decided to renew its consideration of a potential acquisition of Ardea.  The Senior Director also learned that Ardea had reached agreement with the Federal Drug Administration ("FDA") on a Phase III clinical trial plan for its drug candidate, including two specific dosage amounts (200 milligrams and 400 milligrams) for the clinical trials.  The Senior Director also learned that Ardea was willing to provide the drug candidate to PharmaCo so that PharmaCo could conduct its own tests on the compound.

63.     On or about March 7, 2012, the Senior Director learned that Ardea had already received an offer from another pharmaceutical company, and that two other companies were conducting due diligence on Ardea.  The Senior Director also learned that Ardea expected a non-binding offer from PharmaCo by early April, and that, as a result of this deadline, PharmaCo would have to conduct due diligence quickly over the next few weeks.

64.     On or about March 7, 2012, the Senior Director told Maciocio that PharmaCo had renewed its consideration of a potential acquisition of "Athens."  The Senior Director also told Maciocio the drug candidate's dosages and timing for potential FDA approval, and that it had reached agreement with the FDA on a plan for Phase III clinical trials.  The Senior Director shared this news with Maciocio in order to obtain Maciocio's assistance in analyzing PharmaCo's capacity to manufacture Ardea's drug candidate.

65.     On or about March 8, 2012, Maciocio tipped Hobson that PharmaCo had decided to renew its consideration of a potential acquisition of Ardea.  This information was material and nonpublic.

66.     At 9:52 a.m. on the morning of March 8, 2012, Maciocio visited a Yahoo! Finance website about Ardea from his PharmaCo-issued computer.

16

67.     Minutes later, Maciocio started purchasing Ardea securities.  At 9:58 a.m., Maciocio purchased 300 Ardea shares in his Discount Brokerage Account.  At 10:08 a.m., Maciocio wired $25,000 to his Discount Brokerage Account.  Approximately an hour later, Maciocio purchased a total of 2,700 Ardea shares in his Discount Brokerage Account and two other accounts.

68.     At 11:13 a.m., Maciocio placed a brief call to Hobson's cell phone.  Starting at 11:18 a.m. and continuing through that afternoon, Maciocio visited Yahoo! Finance websites about Ardea from his PharmaCo-issued computer.

69.     At 11:38 a.m., Maciocio called Hobson's cell phone for almost three minutes. Immediately after the call, at 11:42 a.m., Hobson placed an order to purchase 1,000 Ardea shares for one of his own retirement accounts.  That evening, Maciocio called Hobson's cell phone and spoke with him for over eighteen minutes.

70.     The next morning, on March 9, 2012, at 8:35 a.m. and again at 8:39 a.m., Maciocio visited Yahoo! Finance websites about Ardea from his PharmaCo-issued computer.

71.     At 8:43 a.m., Maciocio wired $25,000 into his Discount Brokerage Account.

72.     At 9:19 a.m., Hobson called Maciocio for over thirteen minutes.  At 9:34 a.m. Maciocio purchased 500 Ardea shares for his Discount Brokerage Account, and at 11:27 a.m., Hobson purchased 500 Ardea shares for a customer account.

73.     As PharmaCo continued to evaluate a transaction with Ardea, Maciocio and Hobson continued to trade in Ardea securities through the end of March and in early April 2012.

74.     Maciocio purchased Ardea shares on March 16 and 29, 2012 and on April 2 and 5, 2012.

75.     In total, from March 8, 2012 through April 5, 2012, Maciocio purchased 7,400 Ardea shares.[2]

76.     During this time, Hobson also purchased and sold Ardea securities both in his own accounts and in several customer accounts, often trading after speaking with Maciocio.  For example, on March 15, 2012, Maciocio and Hobson had four calls, including a cell phone call lasting over thirteen minutes.  The next day, Hobson purchased 500 Ardea shares for his one of his own accounts.  Similarly, on the afternoon of March 20, 2012, Hobson called Maciocio; on the following morning of March 21, 2012, Hobson placed multiple orders to purchase Ardea shares and call options for his own and customer accounts.

77.     From March 8, 2012 to March 27, 2012, Hobson purchased a total of 4,000 Ardea shares and fifteen Ardea call options for his own accounts, as well as a total of 1,700 Ardea shares for several customer accounts.  Between March 26 and 28, 2012, Hobson liquidated the 4,000 Ardea shares held in his own accounts.  Then, between March 29 and April 9, 2012, Hobson purchased 3,000 Ardea shares and an additional five Ardea call options for himself.

78.     On or before April 9, 2012, Maciocio learned that PharmaCo had decided not to pursue an acquisition of Ardea.  Starting on April 9, 2012, and continuing over the next several days, Maciocio sold 4,000 Ardea shares (which represented approximately half of his total Ardea holdings).

79.     On approximately April 9, 2012, Maciocio tipped Hobson that PharmaCo had decided to abandon its consideration of Ardea.  This information was material and nonpublic.  On the afternoon of April 9, 2012, Maciocio and Hobson had four brief calls on their cell

---

[2]     Additionally, at the time he started purchasing Ardea shares in March 2012, Maciocio had an existing position of 1,000 shares that had been purchased in April 2011.

phones; at 6:54 p.m., Maciocio, using his cell phone, called Hobson's cell phone and spoke with Hobson for almost ten minutes.

80. Shortly after market open the next morning, April 10, 2012, Hobson began liquidating the holdings of Ardea shares in his own and several customer accounts. Over the course of that day and the following day, Hobson liquidated all of the Ardea shares that he had accumulated from purchases in March and April 2012 in his own and customer accounts.

81. On April 20, 2012, Hobson purchased thirty additional Ardea call options for his own accounts, increasing his total holdings of Ardea call options to fifty.

82. At 2:00 a.m. on Monday, April 23, 2012, Ardea announced its acquisition by AstraZeneca for $1.26 billion. At 9:30 a.m. that morning, Ardea shares opened at $31.52 per share, which represented an increase of 51.25 percent from its closing price of $20.84 on Friday, April 20, 2012. The volume of shares traded that day was 13,297 percent higher than the trading volume on the previous trading day of April 20, 2012.

83. At 9:30 a.m. that morning, Maciocio liquidated his entire remaining Ardea position of 4,400 shares, realizing approximately $42,212 in illicit profits.

84. Starting at 8:59 a.m. that morning, Hobson sold his entire Ardea call options position, as well as the Ardea shares in four customer accounts that had been purchased in 2011, realizing illicit profits of approximately $34,113 for himself and approximately $5,445 for his customers.

**E.    Insider Trading in Furiex Securities**

85. In February 2014, representatives of PharmaCo and Furiex began discussions of a potential acquisition of Furiex by PharmaCo. On March 18, 2014, the two companies signed a confidentiality agreement. On March 21, 2014, Furiex opened its electronic data room to

19

PharmaCo so that it could conduct due diligence on the deal. PharmaCo adopted the code name "Fusilli" for Furiex in order to protect the confidentiality of the potential acquisition.

86.    On or before the morning of March 25, 2014, the Senior Director informed Maciocio that PharmaCo was pursuing a potential acquisition of a company with the code name "Fusilli." The Senior Director shared this information with Maciocio because Maciocio's assistance was necessary to determine whether PharmaCo could manufacture "Fusilli's" drug candidate itself or would need to outsource the manufacturing.

87.    In addition, the Senior Director shared with Maciocio several details about "Fusilli" and its leading drug candidate that were necessary for Maciocio to evaluate PharmaCo's internal capacity to manufacture the drug candidate. Although he did not reveal the target company's name, the Senior Director told Maciocio that "Fusilli's" drug candidate was a controlled substance indicated for the treatment of diarrhea predominant irritable bowel syndrome. The Senior Director also told Maciocio that "Fusilli" had announced positive Phase III clinical trial results for the drug candidate and the drug candidate's dosage.

88.    Using the information about "Fusilli" that he obtained from PharmaCo, Maciocio determined that "Fusilli" was Furiex.

89.    Shortly thereafter, Maciocio tipped Hobson that PharmaCo planned to pursue an acquisition of Furiex. This information was material and nonpublic.

90.    At 11:52 a.m. on the morning of March 25, 2014, Maciocio used his cell phone to place a brief call to Hobson's cell phone. At 11:56 a.m., using his work phone, Hobson called Maciocio for six seconds on Maciocio's work phone. At 11:56 a.m., Hobson used his cell phone to call Maciocio on Maciocio's cell phone and spoke to Maciocio for two minutes. In the next couple of minutes, Hobson entered orders to sell a portion of an existing security position in one

of Maciocio's accounts at Broker-Dealer B; a portion of the sale proceeds was later used to fund Maciocio's purchases of Furiex shares. At 12:02 p.m., using their cell phones, Maciocio and Hobson spoke to each other for approximately two minutes.

91.     About an hour after this series of calls with Maciocio, at 12:57 p.m. and then again at 1:15 p.m., Hobson placed orders to purchase a total of 750 Furiex shares in one of his own accounts.

92.     That afternoon, Maciocio used his PharmaCo-issued computer to view Yahoo! Finance websites on Furiex, as well as multiple pages from Furiex's own website, including a page discussing Furiex's drug candidate.

93.     That evening, Maciocio and Hobson had four calls using their cell phones, including a call that lasted approximately fifteen minutes.

94.     On March 26, 2014, Maciocio continued to conduct internet research on Furiex from his PharmaCo-issued computer.

95.     On March 27, 2014 and March 28, 2014, Maciocio purchased a total of 1,300 Furiex shares and Hobson purchased an additional 250 Furiex shares and five Furiex call options for his own accounts. Over the next several days, Hobson also placed multiple orders to purchase Furiex securities for several customer accounts.

96.     From March 31 to April 14, 2014, Maciocio continued to conduct internet research on Furiex from his PharmaCo-issued computer. On or about Thursday, April 10, 2014, the Senior Director informed Maciocio that, over the upcoming weekend, PharmaCo would determine whether to submit an initial bid to acquire "Fusilli."

97.     At 10:40 a.m. on Monday, April 14, 2014, Maciocio purchased 100 Furiex shares.

98.     At 3:25 p.m. that day, the Senior Director learned that PharmaCo had decided to submit an initial bid for Furiex.  At 3:42 p.m., the Senior Director emailed Maciocio an image of a fist showing a "thumbs-up" sign in order to inform Maciocio that PharmaCo had approved the submission of an initial bid for "Fusilli."  At 5:48 p.m., Maciocio used his cell phone to call Hobson's cell phone for almost a minute.  That afternoon, Maciocio also visited Yahoo! Finance websites about Furiex from his PharmaCo-issued computer.

99.     The next morning, April 15, 2014, at 7:14 a.m., Maciocio wired $25,000 into his Discount Brokerage Account.  Between 7:30 a.m. and 8:53 a.m., Maciocio conducted internet research on Furiex from his PharmaCo-issued computer.

100.    Between 9:04 a.m. and 9:11 a.m., Maciocio and Hobson called each other three times using their cell phones; one of the calls lasted approximately two minutes.  At 9:31 a.m., Maciocio began entering orders to sell the securities of three different issuers in his Discount Brokerage Account, and at 9:38 a.m., Hobson began entering orders to sell the securities of six different issuers that Maciocio held in his accounts at Broker-Dealer B.

101.    Starting approximately ten minutes later, Maciocio purchased a total of 1,100 Furiex shares for his Discount Brokerage Account and his accounts with Broker-Dealer B.

102.    Similarly, starting at 9:30 a.m. on April 15, 2012, and continuing through the following day, Hobson placed multiple orders to purchase Furiex securities for his own accounts and several customer accounts.

103.    From April 21 through April 24, 2014, Maciocio conducted daily internet research on Furiex from his PharmaCo-issued computer.

104.    At 9:53 a.m. on April 24, 2014, Maciocio purchased an additional 100 Furiex shares for his Discount Brokerage Account.  Less than an hour later, Maciocio wired $25,000 into his Brokerage Account.

105.    At 9:30 a.m. on Friday, April 25, 2014, Maciocio sold 2,000 shares of another security in two of his accounts.  A few hours later, Maciocio purchased a total of 1,200 Furiex shares in these two accounts.

106.    From April 21 through April 25, 2014, Hobson also placed several orders to purchase Furiex securities for his own and several customer accounts.

107.    Overall, by market close on Friday, April 25, 2014, Maciocio had accumulated 3,800 Furiex shares, and Hobson had accumulated 3,200 Furiex shares and thirteen Furiex call options in his own accounts, as well as 2,315 Furiex shares and five Furiex call options in several customer accounts.

108.    Sometime during the afternoon of Friday, April 25, 2014, shortly after purchasing 1,200 Furiex shares for two of his accounts, Maciocio learned at work that PharmaCo would likely abandon its pursuit of a Furiex acquisition.  Maciocio spoke with Hobson by phone several times later that day.

109.    At 6:40 a.m. on Saturday, April 26, 2014, Maciocio received an email informing him that PharmaCo had decided to abandon the "Fusilli" transaction.  At 9:06 a.m., Maciocio placed a brief call to Hobson; at 10:19 a.m., Hobson called and spoke with Maciocio for almost fourteen minutes; and at 12:57 p.m., Maciocio called and spoke to Hobson for over seventeen minutes.

110.    On Monday, April 28, 2014, at 7:15 a.m., Furiex announced its acquisition by Forest Labs.  At 7:19 a.m., Maciocio placed a brief call to Hobson.

111.    Starting at 8:54 a.m., Hobson started placing orders to sell Furiex securities from his own and customer accounts.

112.    At 9:30 a.m. that day, April 28, 2014, Furiex stock opened at $103.10 per share, which represented an increase of 28.6 percent from its closing price of $80.15 per share on Friday, April 25, 2014.  The volume of shares traded that day was 4,921 percent higher than the trading volume on the previous trading day of April 25, 2014.

113.    Minutes after market open that morning, Maciocio sold all of the Furiex shares he had accumulated in his accounts, realizing $70,719 in illicit profits.

114.    By 10:02 a.m. that morning, Hobson had sold all of the Furiex shares and most of the Furiex call options that he had accumulated in his and his customers' accounts.  From these sales, Hobson realized illicit profits of approximately $30,865 for himself and approximately $40,323 for his customers.

## CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Both Defendants)

115.    Paragraphs 1 through 114 are incorporated by reference as if fully set forth herein.

116.    Maciocio knew or was reckless in not knowing that the information that he obtained from PharmaCo was material and nonpublic, and that he owed a fiduciary duty, or an obligation arising from a similar relationship of trust or confidence, to PharmaCo to keep the information confidential and to refrain both from trading on it and from tipping it.

117.    Maciocio breached a fiduciary duty, or a similar duty of trust or confidence to PharmaCo, by trading for his own benefit on the basis of material nonpublic information that he had misappropriated from PharmaCo and by tipping this information to Hobson.

118.    Maciocio intended to benefit Hobson by tipping him and intended Hobson to trade on the basis of the tips.  Maciocio also had a meaningfully close personal relationship with

Hobson and tipped him in exchange for both actual and expected personal benefits that were objective, consequential and valuable.

119.    Hobson knew or had reason to know that that the information concerning PharmaCo's potential transactions that Maciocio tipped him was material and nonpublic.

120.    Hobson knew or had reason to know that Maciocio had a fiduciary duty, or obligation arising from a similar relationship of trust or confidence, to keep that information confidential, and that Maciocio disclosed that information to him in breach of a fiduciary duty or an obligation arising from a similar relationship of trust or confidence.

121.    Hobson intentionally or recklessly traded on the basis of Maciocio's tips in his own accounts and in customer accounts.

122.    At all times, Maciocio and Hobson acted with scienter.

123.    By virtue of the foregoing, Maciocio and Hobson, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

124.    By reason of the conduct described in this Complaint, Maciocio and Hobson directly or indirectly violated and, unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### **I.**

Permanently restraining and enjoining each of Maciocio and Hobson and their respective agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### **II.**

Directing each of Maciocio and Hobson to disgorge, with prejudgment interest, all ill-gotten gains from the conduct alleged in this Complaint, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)];

### **III.**

Directing each of Maciocio and Hobson to pay a civil monetary penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

## IV.

Granting such other and further relief as this Court may deem just and proper.


Dated: New York, New York
       June 3, 2016

_Joseph G. Sansone_
Joseph G. Sansone
Michael D. Birnbaum
Simona K. Suh
Charu A. Chandrasekhar


SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0523 (Birnbaum)
birnbaumm@sec.gov